Filed 12/16/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| STEVEN E. RUSSELL, | C087916 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UPI-2013-0008086) |
| v. | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Barbara A. Kronlund, Judge. Reversed in part and affirmed in part.

Law Offices of Kenneth N. Meleyco, Kenneth N. Meleyco; The Ehrlich Law Firm, Jeffrey I. Ehrlich for Plaintiff and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part II.

1

Rob Bonta, Attorney General, Danielle F. O'Bannon, Senior Assistant Attorney General, Pamela J. Holmes and Catherine Woodbridge, Supervising Deputy Attorneys General, Jeremy C. Thomas, Deputy Attorney General for Defendant and Appellant.

This appeal arises out of the tragic rape and murder of Rachel Renee Russell, perpetrated by her grandson, Sidney DeAvila. DeAvila suffered from severe mental illness, and at the time of the murder he was on parole. Following her death, Russell's son, Steven Russell,[1] brought an action against the California Department of Corrections and Rehabilitation (Department), alleging that the Department's parole agents had a special relationship with Russell, and they failed to warn her of DeAvila's dangerous propensities. The jury agreed; it found the Department 60 percent at fault for Russell's death by failing to warn her of a foreseeable danger that was unknown to her, and DeAvila 40 percent at fault. It awarded plaintiff $4.5 million in noneconomic damages, which the trial court reduced to $2.7 million given the Department's 60 percent of fault.

The Department appeals; it asserts it had no duty to warn Russell of DeAvila's dangerous propensities and, even if it had a duty to warn, it is immunized from liability.

Plaintiff claims on cross-appeal that the trial court erred in reducing the judgment and imposing sanctions against trial counsel.

Although it is clear that the agents certainly *could* have done more to warn Russell about the danger posed by her parolee grandson as well as to encourage her to take steps to mitigate that danger, here we are compelled to agree with the Department that because the facts presented were not sufficient to establish that there was a special relationship between the agents and Russell, no duty to warn arose. Accordingly, we must reverse the judgment, as we explain in the published portion of our opinion. Because we find no duty to warn, we need not and do not discuss the immunity issue.

---

[1] Due to their shared surnames, we refer to Steven Russell as "plaintiff" and victim Rachel Renee Russell as "Russell."

In the unpublished portion of our opinion, we conclude the trial court did not abuse its discretion in imposing sanctions against plaintiff's counsel. We uphold the sanctions order and reverse the judgment.

## FACTS AND PROCEEDINGS

*Pretrial Procedure*

On February 23, 2013, DeAvila raped and murdered Russell at her home in Stockton. DeAvila was on parole at the time of his crime.

In August 2013, plaintiff filed a complaint alleging that the negligence of the Department's agents contributed to the murder. Plaintiff later amended the pleading to include allegations that DeAvila's parole agents knew he intended to rape and kill Russell but failed to warn her. Plaintiff abandoned those allegations after discovery revealed no evidence anyone knew DeAvila intended to harm Russell. In March 2017, plaintiff filed a second amended complaint alleging DeAvila was "released on parole and placed by parole [agents] into the home of [Russell] where he was to live." The complaint alleged two parole agents, Roy Lacy and Adolfo Romero, formed a special relationship with Russell that gave rise to a duty to warn her of DeAvila's dangerous propensities.

The Department demurred to the second amended complaint; it asserted plaintiff failed to plead facts sufficient to constitute a cause of action because: (1) plaintiff failed to plead facts sufficient to demonstrate special relationship had been established; (2) parole agents did not "place" DeAvila with Russell; (3) Russell did not rely on any representation by Romero that DeAvila was safe to be around her; and (4) there was no evidence any parole agent was aware of a specific threat to Russell such that they had a duty to warn her. The Department further claimed immunity under Government Code sections 820.2 and 845.8.

The trial court overruled the demurrer. The court concluded as relevant here that the second amended complaint alleged a special relationship between Romero and Russell, and plaintiff alleged the Department released DeAvila knowing he was going to

3

Russell's residence and failed to warn her of his dangerousness. The Department then moved for summary judgment in part based on its assertion that plaintiff could not establish that the Department's agents owed a duty of care to Russell, and therefore they had no duty to warn her. The trial court denied the motion. The court found the following triable issues of fact: (1) whether Russell had a special relationship with Romero; (2) whether Romero's instruction to DeAvila and Russell that DeAvila could remain at Russell's home during the day was the equivalent of "placing" DeAvila in Russell's home; (3) whether Romero's conduct of telling DeAvila he could be at Russell's home during the daytime, but had to leave at night, created an unreasonable risk of harm to Russell; (4) whether Russell was a foreseeable victim; (5) whether the Department had a duty to warn Russell of DeAvila's dangerousness; (6) whether the Department's conduct of telling Russell that DeAvila could be at her home during the daytime, but not at night, created a foreseeable risk to Russell; (7) whether the Department was negligent in monitoring DeAvila; and (8) whether the Department's failure to warn Russell of DeAvila's dangerousness was a substantial factor in Russell's death.

During the hearing on the motion, the trial court stated that the issue of whether Russell had a special relationship with one or both of the parole agents is "clearly a factual issue" that is "not something the Court can decide here." Neither party disagreed with that assertion. During motions in limine, the court again asserted that the existence of a special relationship was a question for the jury.

Jury trial commenced in June 2018. As relevant here, the jury was tasked with determining whether a special relationship existed that gave rise to a duty to warn.

*Background*

Russell raised DeAvila and treated him as her son. DeAvila first received psychiatric services at age 12 and was prescribed anti-psychotic medication at age 19. He began to engage in criminal behavior and started receiving treatment from the Department in 2004.

Lacy was DeAvila's parole agent from 2007 to early May 2012, and Romero was DeAvila's parole agent from May 2012 to February 2013, the month of Russell's murder.

*Lacy's Supervision of DeAvila and Contact with Russell*

In July 2007, DeAvila was arrested while on parole for assaulting a co-resident; Lacy documented the incident and noted DeAvila was a danger to himself and others. In August, Lacy discovered that DeAvila tested positive for cocaine use.

In October 2008, DeAvila was arrested and charged with assault with a deadly weapon on his girlfriend. He was found incompetent to stand trial and received treatment. He was tried and convicted in June 2009 and was released on parole in December 2009. In January 2010, DeAvila tested positive for cocaine, and Lacy recommended that DeAvila continue on parole subject to increased drug testing. Lacy checked a box indicating DeAvila's risk level as "high-violent." In November 2010, DeAvila tested positive for methamphetamine.

Because DeAvila lived with Russell while on parole, Lacy went to Russell's house at least twice a month to check on and drug test DeAvila. These visits were never longer than 10 to 15 minutes. Sometimes Lacy would see Russell in her yard while he was in the area visiting other parolees, and he would stop, say hello, and see how she was doing. Lacy could not estimate how many times he checked in at Russell's house during the years he supervised DeAvila.

Lacy had a good rapport with Russell, and plaintiff testified Russell had warm feelings toward Lacy and trusted him because he seemed to care about DeAvila's well-being. According to Lacy, he considered Russell to be a "very nice lady," although he

5

did not describe them as friends. Lacy never gave Russell his personal cellphone number, he never sat on her porch and drank coffee with her, he never hugged her, and he addressed her as "Ms. Russell" and she addressed him as "Mr. Lacy."

Russell received DeAvila's monthly social security checks, and Lacy advised Russell against giving DeAvila all of these funds at once so he would have money to last through the month. Lacy knew at the time of that advisement that DeAvila was using cocaine, and he probably told Russell that DeAvila tested positive for cocaine. Lacy was aware DeAvila had tested positive for methamphetamine use in November 2010, but he did not remember informing Russell of that fact.

Lacy testified that he was never aware that DeAvila posed a threat to Russell, and Russell never told him that she was concerned for her safety. He never told her DeAvila was classified as a "high-violent" parolee, but he never told Russell that it was safe for DeAvila to live in her house.

Plaintiff saw Lacy at Russell's house twice in 2010 or 2011. The first time Lacy was drug testing DeAvila, and Lacy told DeAvila, " 'you better make sure you're doing what your grandma says or else.' " The second time, plaintiff saw Lacy sitting on Russell's porch; he did not see Lacy drinking coffee, but there were two coffee cups. He overheard Lacy call Russell "Mother Russell," and Russell called him "Lacy." Russell's neighbor testified she saw Lacy give Russell a "side hug" as he was leaving her house, and she heard Lacy call Russell "Rachael," and Russell say "okay, Roy."

In February 2011, Russell told Lacy that DeAvila appeared unstable. Lacy noted DeAvila "was talking fast and upset," and he ordered DeAvila to report to the outpatient clinic where parolees can obtain mental health treatment and medication.

In March 2011, Lacy reported that DeAvila was "doing much better" "so long as he takes his meds." Days later, Russell told Lacy that she wanted DeAvila to find his own place to live. Four days after that, DeAvila was arrested for inappropriately touching and soliciting sex from several minors aged eight to 16; he was convicted of a

6

sex offense requiring lifetime sex offender registration under Penal Code section 290 and was sent to prison. Lacy again described DeAvila as "High Violent."

*Psychological Reports*

In December 2011, DeAvila was transferred to Atascadero State Hospital. In February 2012, psychologist Dr. Michael Selby concluded DeAvila had a severe mental illness, noted DeAvila's admission that he experienced auditory hallucinations, and observed DeAvila had a history of paranoid delusional thought process. He diagnosed DeAvila with schizoaffective disorder and alcohol dependence. Selby noted DeAvila's severe mental disorder was a cause or aggravating factor in the commission of the crimes that resulted in his imprisonment in 2008, he was not taking his medication at the time of his crime, and his mental illness was not in remission despite treatment in a highly structured setting. Selby noted DeAvila had a history of treatment noncompliance, and that DeAvila stated he was not planning to take his medication following his release. Finally, Selby concluded DeAvila "represent[ed] a substantial danger of physical harm to others by reason of his severe mental disorder."

Two days later, psychologist Dr. Robert Suiter evaluated DeAvila and concluded he suffered from a severe mental disorder. Suiter noted DeAvila's history of treatment noncompliance and concluded "there is no reasonable likelihood he would follow through with treatment" if released. Suiter observed DeAvila demonstrated homicidal ideation specific to his delusional system, and he had indicated he would act out aggressively towards others he perceived as persons who would harm him. Suiter concluded: "In total, there is more than sufficient data to conclude [DeAvila] presents a significant risk of harm to others."

Neither report discussed whether DeAvila posed a threat to Russell specifically.

In April 2012, DeAvila was released from Atascadero State Hospital, and Lacy transported him to the parole office in Stockton. Upon release, DeAvila went to stay with Russell at her house.

7

*Romero's Supervision of DeAvila and Contact with Russell*

In May 2012, Romero began supervision of DeAvila; Romero worked in a unit that supervised sex-offender parolees and supervised 20 to 30 parolees. Romero did not read the psychological reports written by Selby and Suiter, although they were available to him in DeAvila's file. Romero agreed that, had he been aware of the information contained in the reports written by Selby and Suiter, he would have spoken to his supervisor and potentially prohibited DeAvila from being in Russell's home. DeAvila's file contained a post-it note stating "Racheal" was DeAvila's "Grandma" and listed her telephone number.

As a registered sex offender, DeAvila was prohibited from residing within 2,000 feet of a school or a park where children regularly congregate. (Pen. Code, § 3003.5.) He was also prohibited from establishing a residence not preapproved by his parole agent or consuming alcohol, and was required to comply with curfew restrictions of 7:00 p.m. to 7:00 a.m. and appear at the parole outpatient clinic and a mental health program as directed by his parole officer. He was monitored by an electronic global positioning systems (GPS) unit.

On May 4, DeAvila informed the parole office that he was homeless, and the office issued him a voucher to stay at a local inn. On May 5, DeAvila was out of his approved residence past curfew. On May 7, Romero went to find DeAvila at the inn where he stayed; DeAvila smelled of alcohol and had cut off his GPS device. Romero arrested him for parole violations, and he was released from jail on May 22.

On May 23, DeAvila reported to the parole office accompanied by Russell. DeAvila stated he was transient, and Russell said she wanted DeAvila to stay at her house. Romero explained that DeAvila could not live with Russell due to the proximity of her house to a school. Russell said that DeAvila was "doing fine," that she was "happy with him," and was not happy that he could not live with her.

8

On May 24, DeAvila reported to the parole office smelling of alcohol and marijuana. DeAvila had failed to report to the parole outpatient clinic and violated curfew the night before. Romero arrested DeAvila and took him to jail; the jail released him on June 12.

On June 13, DeAvila arrived at the parole office accompanied by Russell. The parole agent on duty again explained to Russell that DeAvila could not live with her because her house was too close to a school.

On June 29, Russell and Romero had a conversation about DeAvila at Russell's house. Russell said DeAvila was doing "fine," and she did not understand why he could not live with her. Romero replied that DeAvila could be there during the day to charge his tracking device, eat, and shower, but he had to leave at night. Romero told Russell that DeAvila could live at Mormon Slough, a dry creek bed where homeless people live and where other sex offenders who Romero supervised live. Russell did not want DeAvila living at Mormon Slough, but she agreed not to allow him stay in her house at night.

Plaintiff testified that, at some point in 2012--possibly at the same time Romero advised Russell that DeAvila could stay with her during the daytime--Romero promised Russell that he would find DeAvila his own place to live. Plaintiff believed that Romero made the promise because Russell expressed concern about DeAvila living on the streets. Romero denied making such a promise.

On July 3, Romero requested a warrant because DeAvila's tracking device was not charged and he could not find DeAvila; Romero noted DeAvila was transient, unstable, had just been released from a mental hospital, and had a history of assaulting peace officers. On July 9, DeAvila was arrested; he was released the next day with instructions to report to the parole office. DeAvila did not report, and Romero requested another warrant. Romero noted DeAvila's continued presence in the community posed a threat to public safety.

9

On July 13, DeAvila was admitted into the County Mental Health Department after he said he wanted to kill himself. On July 23, Romero received a call that DeAvila was scheduled to be released the following day. DeAvila reported to Romero on July 24, and the parole office issued a voucher for DeAvila to stay at a local inn for a week.

On July 31, DeAvila reported to the parole office and admitted to using methamphetamine for the past few days. Romero instructed him to attend a literacy class the following day, and DeAvila arrived at the class smelling of alcohol and admitted to using methamphetamine for the past week. Romero saw blisters in DeAvila's mouth that he recognized as a symptom of methamphetamine use; Romero knew that methamphetamine use can increase the dangerousness of an unstable person.

On August 14, Romero arrested DeAvila for a curfew violation and for using marijuana and methamphetamine; he was released from jail the following day. He was arrested again on August 16 for using methamphetamine. Romero took him to jail; this was the last time Romero saw DeAvila. DeAvila was released on August 20, but was held by San Joaquin Behavioral Health Services until the following day because he was suicidal.

DeAvila absconded, was arrested, was released, and absconded again. Romero requested warrants each time he absconded, noting DeAvila's continued presence in the community posed a threat to public safety.

On November 21, DeAvila was arrested at Russell's house by an agent from the Department's fugitive apprehension team who was armed and wearing a bulletproof vest, and was accompanied by additional law enforcement. Russell answered the door and gave the officers permission to enter. A report to Romero about the arrest noted that it appeared DeAvila was living at Russell's house. The report also stated Russell said DeAvila stayed with her because he refuses to live on the street. Romero did not check to see if DeAvila was living at Russell's house or report to the parole board that DeAvila

10

was living at Russell's house because he did not approve of DeAvila living there, and DeAvila was only authorized to be there during the daytime.

On November 22, the jail released DeAvila, and later that day Romero received an alert that DeAvila had removed his tracking device. Romero requested a warrant, which noted that DeAvila's whereabouts were unknown, and he posed a threat to public safety.

*Russell's Murder*

Sometime in December 2012 or January 2013, Russell called plaintiff and told him DeAvila was at her house, under the influence of cocaine, and acting out. Unable to control him, Russell "had to pull [out] a knife" to force him to leave. According to plaintiff, Russell told him: "It wasn't a big thing, you know, because he never was a threat. He was just like a deranged spoiled teenager when he was under the influence." At that point, Russell did not want DeAvila at her house because she was tired of the "in-and-out mess" and wanted to live alone. Plaintiff testified that Russell did not attempt to find DeAvila housing because Romero had promised that he would do so. He added that, at some point, he asked Russell to kick DeAvila out of her home, but she did not do so because Romero was helping to find him a place to live.

On February 13, 2013, authorities located and arrested DeAvila and took him to jail. DeAvila was released on February 20.

On February 23, DeAvila raped and murdered Russell at her home. DeAvila put Russell's covered but naked body in a wheelbarrow, which he left in the back yard. Plaintiff discovered her body three days later.

*Expert Testimony*

Retired police officer Ron Martinelli testified for the plaintiff as a law enforcement expert. Martinelli trained parole agents, but he had no experience supervising parolees or working as a parole agent. Martinelli testified that DeAvila's parole violations dating back to May 2012 demonstrated DeAvila was spiraling out of control, indicating his condition was worsening. According to Martinelli, "[t]he only

11

impact strategy that would now work" would be involuntary commitment in a psychiatric facility under Welfare and Institutions Code section 5150. Martinelli opined that the parole agents were obligated to inform Russell that DeAvila had a mental disorder that was not in remission, and to warn her that she was at risk because DeAvila "presented a dangerous circumstance."

*Motion for Nonsuit and Subsequent Jury Instructions and Questions*

At the conclusion of plaintiff's evidence, the Department moved for a nonsuit. It again argued no evidence supported a finding of the existence of a special relationship between either agent and Russell, and immunity. The trial court denied the motion, concluding that "the standards for granting nonsuit have not been met."

The jury was given an instruction stating: "There is no general duty to warn others of third party's conduct. There is a limited exception to this rule if a special relationship exists between the defendant or the third person creating the danger. A special relationship and thus a duty to warn may arise: [¶] [(1)] where the defendant engages in conduct that creates or increases the peril to an individual and the peril is not known or readily discoverable[;] [¶] [or (2)] where the defendant induces detrimental reliance or lulls an individual into a false sense of security." The jury was also given an instruction that read: "A special relationship between one parole agent and another person does not impose a duty of care on the employing agency or any subsequently involved employees."

During deliberations, the jury asked the court to provide a definition of "special relationship." The trial court gave the jury a list of eight factors for it to consider in determining if a special relationship existed. The list was not exclusive, but included: (1) whether agents of the Department used special names to refer to Russell; (2) whether agents would stop by to visit Russell when checking on other parolees; (3) whether agents gave Russell their personal telephone numbers and told her to call them if she had any problems with DeAvila; (4) whether agents had knowledge of the sex offender laws

12

and instructed Russell that DeAvila could stay in her home during the day, but had to leave at night; (5) whether agents led Russell to believe that her permitting DeAvila to stay in her home was safe, when the agents knew that to be false; (6) whether the agents' actions caused Russell to trust and rely on the agents' advice about DeAvila's propensity or lack of propensity for violence toward Russell; (7) whether Russell was dependent on the agents having superior control or knowledge concerning DeAvila, and if so, whether the agents did or did not act reasonably in advising her or protecting her from such violence; and (8) whether the agents "placed" DeAvila in Russell's home by allowing DeAvila to reside in Russell's home.

*Verdict and Post-Trial Procedure*

The jury found: (1) a Department agent or agents knew or should have known that DeAvila was a foreseeable danger to Russell; (2) the agent or agent's instruction to Russell that DeAvila could remain in Russell's home during the day did not amount to "placing" DeAvila in Russell's home; (3) there was a special relationship "between [Department] Parole Agents or an Agent and [Russell]"; (4) an agent or agents failed to warn Russell of the foreseeable danger that was unknown to her; (5) the failure to warn was a substantial factor in causing Russell's death; (6) DeAvila's dangerousness was not known or readily discoverable to Russell before February 23, 2013; and (7) DeAvila was at fault for and a substantial factor in causing Russell's death. The jury found plaintiff's total damages were $4.5 million, that DeAvila was 40 percent at fault, and the Department's agents were 60 percent at fault. The trial court entered judgment against the Department for $2.7 million plus costs, which reflected the jury's finding that the Department was 60 percent at fault for Russell's death.

Plaintiff and the Department each moved for new trial and judgment notwithstanding the verdict (JNOV). Plaintiff moved for a new trial as to $1,500 in sanctions imposed by the court against his trial counsel for his failure to follow a court

13

order during his opening statement at trial.[2]  The trial court denied that motion.

Plaintiff's motion for JNOV sought to reinstate the $4.5 million jury award; the court

denied that motion as well.[3]

The Department's motion for JNOV asserted there was no substantial evidence to

support the jury's special verdict findings that (1) the Department's agents knew or

should have known that DeAvila was a foreseeable danger to Russell; (2) a special

relationship existed between the Department's agents and Russell; and (3) failure to warn

Russell was a substantial factor in causing her death.

Applying the substantial evidence standard, the trial court denied the Department's

motion for JNOV.  The court stated it could not "say that there was no substantial

evidence offered during trial that supported the jury finding a special relationship existed

supporting a duty by [the Department] to warn [Russell] about DeAvila's known

dangerous propensities which created a foreseeable risk of harm to [Russell]."  The court

then stated it "does believe [p]laintiff has established a special relationship and duty

under a theory of defendant having engaged in conduct that increased the peril to

[Russell], and/or the theory of defendant having made representations or otherwise

having engaged in conduct that included detrimental reliance or that lulled [Russell] into

a false sense of security."

The Department's motion for new trial similarly asserted that plaintiff failed to

produce sufficient evidence to support a special relationship, a duty to warn, or a causal

relationship between the Department's actions and Russell's murder.  The trial court

denied the motion, finding the Department's motion procedurally deficient, but noting it

---

[2]  We discuss this sanction in detail in the unpublished portion of our opinion, *post*.

[3]  We omit any discussion of the propriety of this holding given our reversal of the judgment.

14

would have denied the motion even if it were properly before the court for reasons similar to those providing the basis for denying the Department's motion for JNOV.

The Department timely appealed; plaintiff timely cross-appealed. After multiple extensions of time for record preparation and numerous continuances in the briefing schedule, the case was fully briefed on December 23, 2020, calendared for argument on September 8, 2021, and argued and submitted on November 19, 2021.

## DISCUSSION

### I

### *The Department's Duty to Warn Russell*

The Department contends the trial court erred by denying its motions for nonsuit and JNOV because there is insufficient evidence the parole agents had a duty to warn Russell of DeAvila's dangerous propensities. As we will explain, we agree that the evidence elicited at trial did not establish that either agent had a duty to warn Russell of the danger posed by her grandson.

A. *Legal Background*

Whether the Department had a duty to warn Russell turns on ordinary and general principles of tort law. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 715-716.) "It is a fundamental principle of tort law that defendants are liable for injuries caused by their failure to exercise reasonable care." (*Myers v. Quesenberry* (1983) 144 Cal.App.3d 888, 891.) However, " '[t]here must be a legal duty to exercise care under the circumstances, owed to the person injured, and a breach of that duty must be the proximate cause of the resulting injury. [Citations.] Thus, the determination that a duty of care exists is an essential precondition to liability founded on negligence.' " (*Ibid.*)

Our Supreme Court recently clarified that determining whether to recognize a duty to warn is governed by a two-step inquiry. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209.) "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty

15

to [warn]. Second, if so, the court must consult the factors described in [*Rowland v. Christian* (1968) 69 Cal.2d 108] to determine whether relevant policy considerations counsel limiting that duty." (*Ibid.*) As we will explain, because we conclude there was no special relationship or any other set of circumstances giving rise to a duty to warn, we end our analysis there and do not apply the *Rowland* factors.

"As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' " (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 (*Davidson*); see also *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435 (*Tarasoff*) ["When the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct, the common law has traditionally imposed liability only if the defendant bears some special relationship to the dangerous person or to the potential victim"]; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 [duty to warn may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection].) " ' "This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter." ' " (*Zelig*, at p. 1129.)

"Relationships that have been recognized as 'special' share a few common features. Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 620-621.) "The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the

16

defendant who, correspondingly, has some control over the plaintiff's welfare." ' " (*Id.* at p. 621.) "Special relationships also have defined boundaries. They create a duty of care owed to a limited community, not the public at large." (*Ibid.*) Our Supreme Court has described the circumstances under which the government may be liable based on law enforcement's failure to act reasonably in protecting members of the public: the factors to a finding of a special relationship include "detrimental reliance by the plaintiff on the officer's conduct, statements made by them which induced a false sense of security and thereby worsened her position." (*Williams v. State of California* (1983) 34 Cal.3d 18, 28.) "Recovery has been denied, however, for injuries caused by the failure of police personnel to respond to requests for assistance, the failure to investigate properly, or the failure to investigate at all, where the police had not induced reliance on a promise, express or implied, that they would provide protection." (*Id.* at p. 25.)

Bearing in mind these principles, we review several cases considering whether an agent of the government had a duty to warn. In *Morgan v. County of Yuba* (1964) 230 Cal.App.2d 938, a deputy sheriff voluntarily promised to warn the victim if a prisoner, who had threatened the victim's life, was released. The prisoner was released, and he killed the victim. The appellate court recognized an exception to the general rule of "nonliability for an unperformed gratuitous undertaking," or nonfeasance, " 'where a person, *in reasonable reliance thereon*, suffers harm, as by refraining from securing other necessary assistance.' " (*Id*. at p. 944.)

In *Johnson v. State of California* (1968) 69 Cal.2d 782 (*Johnson*), an agent of the government requested that the plaintiff provide a foster home for a 16-year-old boy without warning the plaintiff of the boy's homicidal tendencies and violent background. Subsequently the boy attacked and injured the plaintiff. The plaintiff filed suit against the state for failing to warn her about the boy's history and propensity for violence. Our Supreme Court did not discuss the state's duty in terms of being born of a special relationship, but concluded that "the state's relationship to [the] plaintiff was such that its

17

duty extended to warning of latent, dangerous qualities suggested by the parolee's history or character." (*Id.* at p. 785.) It added that a duty is imposed "upon those *who create a foreseeable peril*, not readily discoverable by endangered persons, to warn them of such potential peril. Accordingly, the state owed a duty to inform [the plaintiff] of any matter that its agents knew or should have known that might endanger [the plaintiff's] family; at a minimum, these facts certainly would have included 'homicidal tendencies, and a background of violence and cruelty' as well as the youth's criminal record." (*Id.* at pp. 785-786, italics added, fn. omitted.)

In *Tarasoff*, *supra*, 17 Cal.3d 425, our high court held that a defendant therapist had a special relationship with the patient giving rise to a duty to warn a potential victim where the patient made specific threats against the victim. (*Id.* at p. 436.) However, the defendant law enforcement who had briefly detained the patient had no duty of care to the decedent because there was no "special relationship" between them and either the victim or the patient. (*Id.* at p. 444.) The court found no facts to support a cause of action under Restatement Second of Torts (1965) section 321, which provides: " 'If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.' " (*Id.* at p. 444, fn. 18.)

In *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, the plaintiffs brought an action against a county after their five-year-old son was killed by a juvenile offender within 24 hours of the offender's release on temporary leave. The plaintiffs alleged that the county was negligent in releasing the juvenile into the community and for failing to warn parents in the vicinity of the juvenile's release. The trial court sustained the county's demurrer, and our Supreme Court affirmed. The court distinguished *Johnson*, *supra*, 69 Cal.2d 782; it observed that the county neither had a special and continuous relationship with the plaintiffs nor knowingly placed the decedent into a foreseeably dangerous position. (*Id*. at p. 751.) The court distinguished *Tarasoff*, *supra*, 17 Cal.3d

425 on the basis that the decedent was not a foreseeable or readily identifiable target of the juvenile's threats. (*Id.* at p. 753.) The court held: "[P]ublic entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims*." (*Id.* at p. 754.)

In *Davidson*, *supra*, 32 Cal.3d 197, the assailant was under surveillance by two police officers for the purpose of preventing assaults and apprehending a man who had previously stabbed other women in the area. The officers were aware of the plaintiff's presence and had identified the assailant as the likely perpetrator of the previous assaults, but they did not warn the plaintiff. Eventually, the assailant stabbed the plaintiff. The trial court sustained the defendants' demurrer, and our Supreme Court agreed the officers had no duty to warn the plaintiff because there was no special relationship between the officers and the plaintiff. (*Id.* at p. 203.) The court recognized a common theme running through cases in which a special relationship had been found "was the voluntary assumption by the public entity or official of a duty toward the injured party." (*Id.* at p. 206.) " 'Absent an indication that the police had induced decedent's reliance on a promise, express or implied, that they would provide her with protection, it must be concluded that no special relationship existed and that appellant has not stated a cause of action.' " (*Ibid.*, quoting *Hartzler v. City of San Jose* (1975) 46 Cal.App.3d 6, 10.)

The court also recognized that a special relationship could be predicated on a victim's dependence upon the police for protection. (*Davidson*, *supra*, 32 Cal.3d at p. 207.) But the court distinguished *Johnson*, *supra*, 69 Cal.2d 782 by concluding the victim's peril was not created by the officers, and the victim did not rely on the officers for protection. (*Ibid.*) The court emphasized: "There is simply no reason to speculate that anyone . . . would have acted differently had the officers not placed the laundromat under surveillance." (*Ibid.*)

19

In *Carpenter v. City of Los Angeles* (1991) 230 Cal.App.3d 923 (*Carpenter*), a witness testified in criminal proceedings. After the hearing, the witness asked a police detective if he should be concerned for his safety, and the detective told the witness "he did not have anything to worry about." (*Id* at p. 927.) The witness relied on the detective's statement and did not act to protect himself. (*Id.* at pp. 931-932.) The police learned that the suspect had put " 'a contract hit' " on the witness but failed to warn him, and the witness was later shot. (*Id.* at pp. 927-929.) The appellate court recognized that a plaintiff may establish a special relationship by showing reliance on the officers' conduct and statements, which induced a false sense of security and thereby worsened the plaintiff's position. (*Id.* at p. 931.)

B. *Standard of Review*

Whether a defendant has a special relationship giving rise to a duty to warn rests on policy and is a question of law. (*Regents of University of California*, *supra*, 4 Cal.5th at p. 620; see also *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770-771 [before deciding whether substantial evidence supports jury verdict as to causation, reviewing court reviews de novo whether the defendant owed duty of reasonable care]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 465 [existence of duty is a question of law "particularly amenable to resolution by summary judgment"]; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 ["[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed."]; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 124 [existence of a duty is a question of law to be decided by the court]; *Thompson v. County of Alameda*, *supra*, 27 Cal.3d at p. 750 [" '[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done' "]; *Barenborg v. Sigma*

20

*Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 76 [whether a duty of care existed under the special relationship doctrine is a question of law]; *Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 507 ["While the existence of a duty of care is a question of law, breach of that duty and resulting damage are questions of fact"]; *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1838 [" 'While breach of duty and proximate cause normally present factual questions, the existence of a legal duty in a given factual situation is a question of law for the courts to determine' "]; *Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 213-216 [trial court must decide whether there was a duty in the first place, including whether there was some " 'special relationship' "].)

"Although duty is a legal question, the factual background against which we decide it is a function of a particular case's procedural posture. On review of a judgment of nonsuit, as here, we must view the facts in the light most favorable to the plaintiff. '[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . .' ' " (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215, as modified (Oct. 17, 2007).)

Similarly, " '[an] appeal from the trial court's denial of [a] motion for [JNOV] is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision.' " (*Paulus v. Crane Co.* (2014) 224 Cal.App.4th 1357, 1362.) " 'The purpose of a motion for [JNOV] is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without

21

foundation.' [Citation.] 'The scope of appellate review is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusions . . . .' " (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743.) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' [Citation.] But we do not weigh the evidence or judge the credibility of witnesses." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639-640.) "Our determination with respect to the presence of the requisite substantial evidence is de novo." (*Id.* at p. 639.)

Here, the trial court--without objection by the Department--instructed the *jury* to make a factual finding regarding the existence of a special relationship between the Department's agents and Russell, and later provided the jury with a list of factors for it to consider when making that determination. This was not correct; as we have explained, the existence of a legal duty in a given factual situation is a question of law that the trial court should have determined. But because the Department did not object to this procedure, on appeal plaintiff contends the jury's factual finding of a special relationship is subject to review for substantial evidence, and asserts that the Department forfeited any argument that we should conduct a de novo review for the existence of a special relationship. However, plaintiff offers no authority--and we are aware of none--holding a party may forfeit application of the proper standard of review by failing to object in the trial court. Further, the Department repeatedly asserted in its briefing below that the question of duty was a legal question to be decided by the trial court. Accordingly, we disregard the jury's actions on this issue and review de novo whether a special relationship existed, viewing the facts in the light most favorable to plaintiff.

C. *Analysis*

We analyze whether Lacy or Romero had a duty to warn Russell of DeAvila's dangerous propensities, of which they clearly were aware. Based on the forgoing authorities, had either agent formed a special relationship with Russell, that formation

22

would have given rise to a duty to warn.  We examine whether either agent formed that special relationship by making an express or implied promise of protection to Russell that caused her to detrimentally rely on that promise, or by otherwise lulling Russell into a false sense of security, inducing detrimental reliance and causing her to worsen her position.  (*Williams v. State of California*, *supra*, 34 Cal.3d at p. 28; *Morgan v. County of Yuba*, *supra*, 230 Cal.App.2d at p. 944; *Carpenter*, *supra*, 230 Cal.App.3d at p. 931.)  A duty to warn could also have arisen if one of the agents *created* a foreseeable peril that was not readily discoverable by Russell.  (See *Johnson*, *supra*, 69 Cal.2d at pp. 785-786.)

In arguing that the agents had a duty to warn Russell, plaintiff combines the conduct and representations of both Lacy and Romero and applies the factors for establishing a special relationship provided to the jury by the trial court; we recited these factors *ante* in our discussion of the trial court's charge to the jury.  As relevant to our de novo analysis here, plaintiff first contends Lacy's relationship with Russell gave her the right to expect his protection in matters related to DeAvila's parole and wellbeing, and he argues that Romero lulled Russell into a false sense of security by authorizing DeAvila to spend his days at Russell's house and by promising to help find DeAvila a place to live, which impliedly conveyed that DeAvila was safe to have in her home.  Although plaintiff analyzes the conduct of the agents together, we analyze each agent's statements and conduct and any resulting detrimental reliance separately; a special relationship between Russell and one agent does not transfer to another agent.  (See *Baker v. City of Los Angeles* (1986) 188 Cal.App.3d 902, 908 [a special relationship established by one officer's voluntary act does not obligate the entire department]; *Zelig v. County of Los Angeles, supra*, 27 Cal.4th at pp. 1129-1130 [government employee's conduct establishing a special relationship "on one occasion does not, by itself, give rise to a continuing special relationship and duty at a later date—or with other [employees]"].)

At the outset, we acknowledge that both Lacy and Romero were aware or should have been aware that DeAvila suffered from mental illness, abused drugs, had a history

of violence, and posed a danger to those around him. DeAvila was arrested while on parole in 2007 and 2008 for assault, first on a co-resident, then on his girlfriend. Lacy categorized DeAvila as a "high-violent" parolee, and was aware DeAvila had tested positive for both cocaine and methamphetamine. In February 2011, Lacy referred DeAvila to an outpatient clinic for mental health treatment, and the next month reported that DeAvila was better, but conditioned on medication.

Between May and November 2012, Romero was aware that DeAvila had repeatedly violated his parole by using marijuana, methamphetamine, and alcohol, removing his GPS monitoring device, and absconding. Romero requested multiple warrants for DeAvila's arrest, each one asserting that DeAvila's presence in the community posed a threat to public safety. Romero was also aware that DeAvila had undergone mental health treatment due to suicidal ideation.[4]

There is nothing to suggest, however, that either parole agent was aware that DeAvila posed a *particularized threat of harm to Russell*. Russell raised DeAvila from a young age, and no evidence suggests that either agent was aware of any incident in which DeAvila had ever been violent toward Russell or threatened her. Even the Selby and Suiter reports, which concluded that DeAvila posed a general danger of physical harm to others, did not mention Russell by name.

### 1. *Lacy*

With that background in mind, we turn to the nature and extent of the contacts each agent had with Russell. Plaintiff contends that Russell would go to Lacy if she had any issues or concerns about DeAvila, and the nature of their relationship gave her the

---

[4] The Selby and Suiter reports were available to Romero in DeAvila's file, although Romero did not read them. Plaintiff points to no duty of a parole officer to read all reports in a parolee's file. Absent such an argument, we do not conclude that Romero was required to read those reports. Nevertheless, Romero was aware that DeAvila was a mentally ill drug user who posed a threat to public safety.

right to expect his protection in matters related to DeAvila's parole and wellbeing. However, as we will explain, those contacts with Russell were not sufficient to establish a duty to warn her of DeAvila's dangerous propensities.

Russell and Lacy interacted at least twice per month and were friendly, Lacy was aware that DeAvila was living with Russell and authorized that arrangement, and he checked in on Russell when he was in the neighborhood. Lacy regularly drug tested DeAvila, he assisted Russell by ordering DeAvila to obtain mental health treatment when he appeared mentally unstable in February 2011, and he agreed to help DeAvila find his own place to live in March 2011, just days before DeAvila was arrested for sex crimes. And Lacy advised Russell, who received DeAvila's social security checks, to not give DeAvila all of the funds at once so he would have money through the month.

While we recognize that Lacy and Russell had a positive relationship, these contacts do not establish that Russell *detrimentally relied* on any representations by Lacy. Lacy never expressly represented to Russell that DeAvila was safe or that he would protect her from DeAvila, and Russell never expressed any concern for her safety or suggested that she required Lacy's protection from DeAvila. Russell never called Lacy for protection from DeAvila while he was under the influence or otherwise, and Lacy never physically intervened to protect Russell from DeAvila.

Additionally, while Lacy assisted Russell by ordering DeAvila to undergo mental health treatment in February 2011, that incident demonstrates Russell was *not* dependent on Lacy for protection. Russell assessed DeAvila's mental health status and took affirmative steps to obtain treatment for him. Lacy neither independently determined that DeAvila appeared unstable nor was required to intervene because Russell was unable to manage the situation. Rather, Russell utilized Lacy as a point of contact and an appropriate resource for obtaining treatment for DeAvila, demonstrating her capability of managing that situation. There is nothing to suggest that Russell would not have been

25

able to take similar steps to obtain appropriate treatment for DeAvila had Lacy not been his parole officer, or had he not been on parole.

Similarly, Lacy's advice to Russell regarding the need to ration DeAvila's income does not demonstrate that Russell detrimentally relied on Lacy for protection. Russell did not indicate that she feared for her safety or ask Lacy for protection regarding the rationing. There is no evidence that Russell felt comfortable meting out DeAvila's social security income only because Lacy was available to protect her from potential violence.

Further, Lacy's promise to help DeAvila find a place to live in March 2011 did not induce detrimental reliance; the fact that DeAvila was arrested and taken into custody four days later belies that suggestion. Following DeAvila's release from the State Hospital in April 2012, Lacy drove DeAvila to the parole office, after which time Lacy was no longer his parole agent. Soon thereafter, in May 2012, Russell requested that DeAvila be allowed to live with her again. There is no evidence that Russell detrimentally relied on Lacy's promise to find DeAvila a place to live.

Thus, the record lacks sufficient evidence to demonstrate that Russell detrimentally relied on actions or representations by Lacy such that a duty to warn arose. There is nothing in the record that would suggest Russell allowed DeAvila to live with her based on anything Lacy did or said, and while Lacy provided Russell with a helpful resource, Russell never indicated that she feared for her safety or demonstrated that she relied on Lacy to protect her from DeAvila. Therefore, we conclude that the requirements for the special relationship that the law requires exist between Lacy and Russell before Lacy developed a duty to warn her of DeAvila's propensity for violence were not met.

2. *Romero*

We turn next to whether Romero had a duty to warn Russell of DeAvila's dangerous propensities. Plaintiff contends that Romero impliedly promised Russell that DeAvila was safe to be around, lulled her into a false sense of security, and created or

26

increased her peril by authorizing DeAvila to spend his days at her house, but requiring him to leave at night. Plaintiff also asserts that Romero induced detrimental reliance by promising Russell that he would help DeAvila find his own place to live.

We first observe that there is no evidence Romero expressly told Russell that DeAvila did not pose a danger to her, nor is there any evidence that Romero, in authorizing DeAvila to spend his days at Russell's house, intended to convey anything about the safety of the proposed arrangement. Rather, Romero authorized DeAvila to spend his days, but not his nights, at Russell's house specifically because he was a registered sex offender, and she lived too close to a school. (Cf. *Carpenter*, *supra*, 230 Cal.App.3d at p. 929 [detective informed the plaintiff that the robbery suspect presented no danger to his life or safety].)

There is little to no evidence that Russell interpreted Romero's permission to DeAvila to spend his days at her house as an implied promise that DeAvila posed no threat to her. Russell never mentioned that she feared for her safety or asked Romero for his opinion as to whether DeAvila posed any danger to her. As we have discussed, Russell had raised DeAvila from a young age and presumably knew him well. Despite his parolee status and whatever else she knew of his history, she repeatedly requested permission for DeAvila to live with her. She accompanied DeAvila to the parole office on May 23 and requested that DeAvila be allowed to live with her; she argued that DeAvila was "doing fine" and asserted that she was "happy with him." On June 13, Russell again requested permission from the parole officer on duty to allow DeAvila to live with her. On June 29, when Romero authorized the daytime arrangement, Russell again told him that DeAvila was doing "fine" and that she wanted him to live with her. Thus, Romero's authorization occurred following repeated efforts by Russell to convince the agents that DeAvila was doing well and should be allowed to live with her; nothing suggests that Russell had any safety-based reservations about the arrangement or that she interpreted Romero's authorization as a promise that DeAvila was not a threat to her

27

safety. Indeed, Russell would have had little reason to rely on Romero's representation that DeAvila posed no threat to Russell, even if given, as Romero had only supervised DeAvila since April. Accordingly, there is no basis on which to conclude that Romero's June 29 authorization of DeAvila spending his days at Russell's house was either intended to promise that she would be safe or was interpreted by Russell to include such a promise.

Plaintiff raises two arguments supporting his contention that Russell relied on Romero's authorization as a promise that DeAvila posed no threat to her safety. He asserts that Russell's reliance on Romero's purported promise to her detriment is shown by the fact that she allowed DeAvila to spend time in her home. But the issue before us is not whether Russell acted to her detriment by allowing DeAvila to spend time in her home. Tragically, there is no dispute but that she did. Rather, the issue before us is whether Russell detrimentally *relied on* any representation or promise coming from Romero and regarding Russell's safety from DeAvila. As we have discussed, the record does not support the conclusion that Romero made any such representations or promises or that Russell interpreted Romero's authorization as such.

Plaintiff also argues that the incident in which Russell threatened DeAvila with a knife in December 2012 or January 2013 demonstrated that she had internalized Romero's promise regarding the absence of any threat posed by DeAvila. But that assertion is entirely speculative. Even if Romero's authorization *could* be construed as a promise, there is no dispute that it was an implied promise, not one that was explicitly stated. Moreover, as we have discussed, there was little reason for Russell to interpret Romero's authorization as a promise.

Further, there is no evidence that the effect of such a subtle, implied promise--assuming it was a promise at all--was or even could have been so strong such that Russell internalized it and relied upon it six or seven months after it was made. That is especially true give that, after the authorization, DeAvila had repeatedly cut off his GPS device and

28

absconded, had twice been admitted into healthcare facilities due to suicidal ideation, had been arrested for using marijuana and methamphetamine, and was eventually arrested in November at Russell's house by multiple law enforcement officers. In fact, by the end of 2012, Russell was avoiding spending time at her house when DeAvila was there and stayed with her son instead. We recount these facts not to suggest that Russell necessarily should have known the full extent to which DeAvila posed a danger to her and to other members of the community or that her conduct brought about this tragedy in any way, but rather to contradict the assertion that the evidence showed Russell internalized a purported promise made in June by Romero that it was safe for her to spend time alone with DeAvila.

Finally, we conclude Romero's purported promise to find DeAvila a place to live did not give rise to a duty to warn. Romero purportedly promised to find DeAvila a place to live in June 2012, after which he did not speak with Russell again. As we have discussed, Romero did not make any promise that DeAvila posed no threat to Russell, so we fail to see how a promise regarding finding DeAvila a place to live could give rise to a duty to warn Russell of DeAvila's dangerous propensities. Moreover, even if a promise to find a person housing could support a duty to warn of dangerousness, by the time of her murder in February 2013 Russell could not reasonably rely on Romero's purported promise from June 2012. Romero spoke with Russell a total of two times; the final time they communicated was seven months before her murder. In the absence of any communication whatsoever, Russell could not have reasonably relied on Romero's promise to find DeAvila a place to live, to the extent that Romero ever made such a promise.

We do not suggest in any way that Russell's actions as a patient and hopeful grandmother simply trying to help her grandson brought about this terrible tragedy. The narrow issue before us is whether agents Lacy and Romero developed a duty to warn Russell of DeAvila's dangerous propensities due to the forming of a special relationship

between the agents and the victim.  Our de novo review of the record, considering the facts in the light most favorable to the plaintiff, does not disclose evidence that supports imposing such a duty on either agent.  Therefore, must we reverse the judgment.

## II

### *Sanctions Against Plaintiff's Counsel*

Plaintiff contends the trial court abused its discretion by imposing sanctions under Code of Civil Procedure section 177.5[5] against trial counsel, Kenneth Meleyco, based on his violation of the court ruling on a defense motion in limine, and for arguing during his opening statement in violation of a court order prohibiting him from doing so.  As we will discuss, we conclude the court's $1500 sanction order was not an abuse of discretion.

A.  *Standard of Review*

We review a trial court's decision to impose monetary sanctions under Code of Civil Procedure section 177.5 for an abuse of discretion.  (*People v. Tabb* (1991) 228 Cal.App.3d 1300, 1311.)  " ' "That discretion must be exercised in a reasonable manner with one of the statutorily authorized purposes in mind and must be guided by existing legal standards as adapted to the current circumstances." ' [Citations.]  Discretion is abused when it exceeds the bounds of reason, all of the circumstances being considered."  (*People v. Ward* (2009) 173 Cal.App.4th 1518, 1527 (*Ward*).)  "[A]n abuse of discretion will be found on appeal if a sanctions order rests on incorrect legal premises [citation] or violates due process, matters we decide exercising our independent review.  Alternatively, an abuse of discretion will be found if the findings underlying the order under review are factually unsupported [citation], which requires us to 'assess[] the

---

[5]  Section 177.5 provides in relevant part:  "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification.  This power shall not apply to advocacy of counsel before the court. . . ."

record for substantial evidence to support the court's express or implied findings.' " (*People v. Landers* (2019) 31 Cal.App.5th 288, 304.)

It is plaintiff's burden on appeal to show that the trial court abused its discretion. (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.)

B. *Procedural History*

At trial, the court granted the Department's motion in limine prohibiting "reptile theory" arguments, which are improper appeals to a jury's emotions by arguing a defendant's conduct threatens the community's safety. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 599.)

During the first hour of Meleyco's opening statement, defense counsel objected 20 times on the grounds that Meleyco was "testifying," 17 of which were sustained, and 20 times that Meleyco was presenting improper argument--three of which also included objections for testifying--14 of which were sustained and three for which the rulings were not reported.

At a break in Meleyco's opening statement, the trial court issued a "cease and desist order" prohibiting Meleyco from testifying or arguing for the remainder of his opening statement. The court warned that it could impose sanctions up to $1,500 for each violation of that order. Following the break, the court sustained two additional objections to improper argument, and one objection to reptile argument, which we discuss in greater detail, *post*.

At the next court session, the trial court held a sanctions hearing "akin to an order to show cause." The court determined that Meleyco violated its in limine order regarding reptile theory arguments--which, the court recognized, were also argumentative statements--characterized the first hour of Meleyco's opening statement as "nearly all . . . argument," and noted that it sustained two additional objections for arguing after it issued its "cease and desist" order. After providing Meleyco with the opportunity to be heard,

31

the court imposed sanctions of $1,500 pursuant to Code of Civil Procure section 177.5 "for violation of lawful court order without good cause or substantial justification."

C. *Analysis*

" ' "The purpose of the opening statement is to inform the jury of the evidence the [party] intends to present. . . ." [Citation.] "Nothing prevents the statement from being presented in a story-like manner that holds the attention of lay jurors and ties the facts and governing law together in an understandable way." ' [Citations.] In turn, '[c]losing argument presents a legitimate opportunity to "argue all reasonable inferences from evidence in the record." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342; see also *People v. Dennis* (1998) 17 Cal.4th 468, 518 [function of opening statement "is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning"].)

After the trial court issued its "cease and desist" order, it sustained objections to the following two passages of Meleyco's opening as argumentative:

"Now, the other thing I want to talk about is the defenses that [the Department] will have here. [¶] They'll tell you that, number one, that you can't predict future violence. They'll also tell you that they are not responsible for him; and, number three, she should have known, and our position to their defenses is 'Yeah, she knew him well. Did she know he was homicidal' --"

"Now, I want to talk a little bit about damages because we are asking, as you heard yesterday, for an award of 20 million dollars and so the key to what the award should be is the relationship between [Russell] and her son, [plaintiff]."

Plaintiff asserts that these passages did not provide the trial court with a reasonable basis to impose sanctions because they were not argumentative. He adds that even if Meleyco argued, his violation of the court order was inadvertent or done with good cause or substantial justification because the line between proper discussion of the facts and improper argument is "hazy."

32

At the outset, we observe that whether a violation of a court order is inadvertent is irrelevant to the issue of whether the trial court abused its discretion by imposing sanctions. (*People v. Tabb*, *supra*, 228 Cal.App.3d at p. 1311 [standard for imposing sanctions is violation of a court order done without good cause or substantial justification, not willfulness].) Here, although we do not consider these passages to be egregiously argumentative, we conclude the trial court did not abuse its discretion by sustaining the objections. (See *Garcia v. Rehrig Internat., Inc.* (2002) 99 Cal.App.4th 869, 874 [trial court's determination as to whether attorney misconduct took place is reviewed for abuse of discretion].)

In the first passage, Meleyco set forth the arguments he expected the defense to make: that the harm to Russell was not foreseeable, that the Department had no duty to control DeAvila, and that Russell should have known that DeAvila posed a danger to her. But rather than inform the jury of the expected evidence, or prepare the jury to follow the evidence and "discern its materiality, force, and meaning" (*People v. Dennis*, *supra*, 17 Cal.4th at p. 518), Meleyco then argued plaintiff's position as to *why* the jury should reject those defense arguments. In doing so, he strayed beyond proper opening statement into improper argument. The trial court did not abuse its discretion in sustaining the objection to that passage.

In the second passage, Meleyco argued that the "key" factor for determining whether to award plaintiff $20 million was the close relationship between him and Russell. Plaintiff concedes that Meleyco's discussion of how the relationship between plaintiff and Russell constitutes the "key" for determining the amount of the award could be improper argument, but he contends that, here, Meleyco was simply making a preliminary reference to the point that Russell and plaintiff had a close relationship. While we agree that Meleyco's statement straddles the line between properly tying the facts and law together, and improperly arguing for a specific jury award, we do not conclude that the trial court abused its discretion in sustaining the objection.

The trial court also sustained an objection to the following statement as a violation of the court's in limine ruling prohibiting reptile arguments: "[W]e as citizens rely on [the Department] and peace officers. We give them extraordinary rights --." Following the sustained objection, Meleyco continued: "What we are saying is that they didn't read these reports, that I mentioned, the Selby and Suiter reports, and the evidence will show they betrayed her trust." At the sanctions hearing, the court also recognized that these statements are argumentative.

These statements are not comparable to the reptile theory arguments in *Regalado v. Callaghan*, *supra*, 3 Cal.App.5th at pages 597 to 598, to which the trial court analogized. In *Regalado*, an attorney in closing argument argued that the jury is " 'the conscience of this community,' " that it will " 'speak on behalf of all the citizens,' " and that it will " 'make a decision what is right and what is wrong; what is acceptable, what is not acceptable; what is safe, and what is not safe.' " (*Ibid*.) Meleyco's statements did not inform the jurors that they are the conscience of the community, that they will decide what is right and wrong or safe and unsafe, or make any similar argument.

However, we agree with the trial court that the statements were argumentative. That citizens rely on peace officers and give them extraordinary rights is a point properly reserved for summation. Additionally, while defense counsel did not object, Meleyco's statement that "they betrayed her trust" is also an argument properly reserved for closing.

We further conclude the trial court did not abuse its discretion in concluding that Meleyco lacked good cause or substantial justification for violating its order. In determining whether the court abused its discretion, we do not substitute our judgment of the correct result for the decision of the trial court. (*McClain v. Kissler* (2019) 39 Cal.App.5th 399, 414.) When considering that the court had only just issued its order prohibiting Meleyco from arguing during his opening statement, the court was within its discretion to conclude that these multiple argumentative statements supported sanctions.

Plaintiff raises multiple other arguments, which we conclude lack merit. He argues that the trial court improperly imposed sanctions based on Meleyco's conduct before the court issued its order. But although the court stated that Meleyco had repeatedly argued his case during opening "despite numerous warnings, admonitions, instructions, and finally lawful court order to cease and desist argument in opening statement," the court expressly imposed sanctions for Meleyco's "violation of a lawful court order without good cause or substantial justification." We do not agree that Meleyco's "violation of a lawful court order" could refer to conduct occurring before the order was issued.

Plaintiff also contends that the sanctions order was impermissibly based on Meleyco's advocacy. But sanctions were imposed based on his violation of a court order, not for Meleyco's "persistently and vehemently arguing his point or for being wrong in his arguments." (*Ward*, *supra*, 173 Cal.App.4th at p. 1531.)

Next plaintiff argues he was denied due process because the trial court had decided to impose sanctions before it conducted the hearing, which was a mere formality. (See *People v. Hundal* (2008) 168 Cal.App.4th 965, 970 [due process requires " 'an objective hearing at which the person is permitted to address the lawfulness of the order, the existence of the violation, and the absence of good cause or substantial justification for the violation' "].) But Meleyco was given an opportunity to respond, and there is no indication that the court did not consider Meleyco's argument. Accordingly, we conclude the court did not violate plaintiff's due process rights. (*Ward*, *supra*, 173 Cal.App.4th at pp. 1524-1525.)

Finally, plaintiff contends that the trial court lacked a valid basis for ordering Meleyco to preface every factual reference in his opening statement with the phrase "the evidence will show." Plaintiff overstates what the court required; the court stated that Meleyco could preface "a big narrative" with, for example, "[t]he evidence will show," "[t]he witnesses will say," or "X witness will testify to." Further, the sanctions order was

35

based on Meleyco's argumentative statements made after the court issued its "cease and desist" order, not on any improper testifying.

## DISPOSITION

The judgment against the Department is reversed. The trial court's order imposing sanctions against defense counsel Kenneth Meleyco under Code of Civil Procedure section 177.5 is affirmed. The parties are ordered to pay their own costs of this appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Raye, P. J.

_____/s/_____
Mauro, J.